GEORGE KEENHOLD, Appellant, v. CHARLES A. DUDLEY, Judge, Appellee.

**CONTEMPT:** Conviction—Certiorari to Review—Power of Court to
1 **Review Evidence.** The appellate court, on certiorari to review
a judgment of conviction in contempt proceedings, has undoubted
power *to review the evidence* and determine its sufficiency to sustain
the conviction. Evidence reviewed, and held insufficient to support
a conviction, owing, (a) to the impeachment and hopelessly bad
character of the witness upon whose testimony the conviction was
had, and (b) *to the total lack of corroboration of such witness.*

WEAVER and PRESTON, JJ., dissent.

**CONTEMPT:** Conviction—Annulment—Deference to Judgment of
2 **Trial Judge Not Controlling.** Deference to the judgment of the
trial court that defendant in contempt proceedings is guilty will
not be allowed to be controlling on certiorari to review the convic-
tion, when, concededly, the acts constituting the alleged contempt
were not done in the presence of the court, and the judge thereof
has no *peculiar* personal knowledge concerning such acts.

*Appeal from Polk District Court.*—CHARLES A. DUDLEY,
Judge.

WEDNESDAY, NOVEMBER 22, 1916.

THIS is a certiorari proceeding, in the nature of an ap-
peal from an order of the district court of Polk County in
a contempt proceeding adjudging the plaintiff Keenhold
guilty of contempt of court, and adjudging fine and im-
prisonment against him therefor. The information against
Keenhold charged that he had attempted to improperly influ-
ence a juror, one Fred Blackburn, to favor the defendants
in the verdict to be rendered in a case then on trial, entitled
*Powers et al. v. Everist et al.* The plaintiff herein challenges
the sufficiency of the evidence to sustain the conviction.—
*Reversed* and *Annulled.*

*Miller & Wallingford,* for appellant.

*Dale & Harvison, Thomas A. Cheshire,* and *Brammer, Lehmann & Seevers,* for appellee.

EVANS, C. J.—I.   The question thus presented is whether the juror Blackburn, upon whose evidence alone the conviction rests, is so conclusively impeached in character and his evidence herein discredited to such a degree that it ought not to be accepted as of any weight whatever unless corroborated. He was one of the jurors in the case of *Powers v. Everist.* Such case was on trial before Judge Dudley in the district court of Polk County for a period of 6 or 7 weeks in February and March, 1914. Mr. Read was one of the attorneys for the defense in that case. As the trial was approaching the end, Blackburn called Read over the telephone, on the evening of March 18th, and suggested in effect that he could be of service to him for a consideration, and made an appointment to meet him in the morning. Read immediately disclosed to his associates and to the presiding judge these advances of the juror, but he did not meet his appointment with him in the morning. Other telephone calls from Blackburn resulted, whereupon he was invited to a certain room near Mr. Read's office, where his proposition was elaborated. In brief, it was a proposition to accept $50 for hanging the jury. In the meantime, it had been so arranged between Mr. Read and Judge Dudley that Judge Dudley should walk into the room while the pretended negotiations were in progress, and this arrangement was carried out. Blackburn knew that Keenhold was well acquainted with Read. His preliminary question over the telephone to Read was whether George Keenhold was a good friend of Read's, to which Read answered in the affirmative. He then intimated to Read that Keenhold had made a proposition to him in the interest of Read. In his testimony, he has testified very directly and positively that Keenhold suggested to him and

1. CONTEMPT: conviction: certiorari to review: power of court to review evidence.

urged upon him the course which he pursued; also that he pursued such course for the purpose only of entrapping Keenhold, and that he intended to disclose the entire plot to Judge Dudley at the appropriate time. Contempt proceedings were immediately instituted against Blackburn, and he was duly convicted and punished. His testimony herein implicating Keenhold was all denied by Keenhold specifically and definitely. Thereupon, impeaching evidence was introduced as against Blackburn. Several policemen who had known him for many years testified as to his bad moral character and to his bad reputation for truth and veracity. It was made to appear also that he was a man without occupation; that several years ago he was convicted in the district court of Polk County of burglary and sent to the penitentiary; that, in the very month of February, 1914, either during the period of his service as a juror or immediately before, he was caught in the act of petit larceny; that by his own admission he was at that time under the influence of cocaine; that he was a habitual user of opium; that during the trial he was using some drug, as observed by some of his fellow jurors; that he used intoxicating liquors habitually and to excess; that on March 3d he requested the loan of a dollar from Keenhold and was refused. All the foregoing matters are undisputed in the record, except that Blackburn denied that he had attempted to borrow a dollar from Keenhold on the date in question.

It appears from the record also that Blackburn, as witness herein, testified to matters which are clearly shown to be false. In his negotiations with Read, he told Read that he would have to divide the money with the juror at his right. He testified, however, that he had not agreed to divide with anybody, and that he had not told Read to that effect. He also testified that during the trial he used no intoxicating liquors except at home, and that he did not visit any saloon. The testimony of a policeman was that he saw him visiting saloons every day during that period. He

testified also, as already indicated, that he was intending to disclose the plot to the presiding judge as soon as it had proceeded far enough to entrap Keenhold. This testimony was clearly false.

The alleged incident upon which the State relies for corroboration is that, on March 3d, during a brief recess, Keenhold offered intoxicating liquors to a group of three or four jurors in one of the corridors. Two jurors testified to the incident, such as it was. The contention of Keenhold on the trial was that the incident referred to was a mere jest, and that he in fact offered no liquor, except by a jesting word, and that he in fact had no liquor. This contention is entirely consistent with the testimony of the jurors as witnesses. Juror Goodbarn testified as follows:

"I have known George Keenhold for many years. He is of a jolly, light-hearted disposition and does joke sometimes. I do not know when he talked to us in the corridor whether he really meant for us to have a drink or whether he was joking and joshing about it. I saw no whiskey."

Juror Davis testified as follows:

"In the interview in the corridor about stocking the fish pond, somebody whom I don't remember was coughing. What Keenhold said struck me as being a facetious remark, and it did not strike me very seriously. No liquor was shown. It does not seem to me as though Keenhold made any effort to draw any liquor out of his pocket. The incident passed right out of my mind as having no importance at all. I did not obtain the impression from what Keenhold said that a bona fide invitation to drink had been extended. Juror Blackburn tried to borrow money of me a time or two."

If Keenhold did offer intoxicating liquor to these jurors, he was guilty of reprehensible conduct which would have merited punishment on its own account. Even then we see no fair way to connect it with the charge against him in this proceeding, or to treat it as corroboration. But we do not

think that the evidence at this point would justify a finding that the intoxicating liquor was offered to these jurors in fact, or that any intentional wrong was attempted.

We feel compelled to say, therefore, that, as to the particular offense charged in this proceeding, the testimony of Blackburn was wholly uncorroborated. Not only was such testimony wholly uncorroborated, but there appear in the record significant circumstances which have a clear tendency to corroborate the denials of Keenhold. Keenhold and Blackburn, though acquainted for many years, were not friends. They had never had anything to do with each other, socially or otherwise. Blackburn himself testified as follows:

"I have known Keenhold for the past 15 or 18 years, and ever since he was deputy sheriff under Sheriff Stout. I had some trouble with Keenhold while he was deputy sheriff. While Keenhold was deputy sheriff, I was convicted of a felony in this county and served time under that conviction. Since that time, I haven't had a friendly feeling toward George Keenhold. I never told Keenhold that I felt unfriendly toward him. Since my first trouble years ago with Keenhold, I have never had any conversation with him before the Powers trial, except to occasionally speak to him in passing."

At the time of Blackburn's previous conviction, **Keen**hold was deputy sheriff and had official connection **with the** prosecution.

Blackburn testified, concerning his attempted negotiations with Read, that on one or two occasions he started towards Read's office, but desisted, for fear of being seen to go there. If he had the understanding with Keenhold which he pretended to have, he gave no reason, and none is conceivable, why he should not have depended on Keenhold, whom he supposed to be Read's friend, to do the negotiating with Read. Keenhold was deputy game warden, and was engaged about his official duties in and about Des Moines at the very time the attempted negotiations with Read were had

by Blackburn. Unless Keenhold had an understanding with Read, he had no possible motive to do what he is alleged to have done. It is not claimed that he had any such understanding, or that there was any taint whatever upon either party to the case or upon any attorney in the case. Indeed, the State expressly disclaims any theory of that kind. Keenhold had no acquaintance with any party to the case nor with any attorney except Read. Blackburn testified herein as follows:

· ''I had reasons for not informing Judge Dudley promptly after meeting Keenhold in Hood's saloon. I know that Judge Dudley daily instructed us to inform him of anyone who conferred with us about jury service. I intended to tell Judge Dudley as soon as I found out how far Keenhold would go with his proposition. When Mr. Keenhold told me he was going out of town and for me to see Mr. Read, I knew then that Mr. Keenhold had gone as far as he intended to go, but I still did not inform Judge Dudley because I wanted to see what Read was going to say or what he would do. I did not know but what maybe Read was in with Keenhold. . . . I made no effort to find out whether or not Keenhold had in fact left town. He said he was going out of town, and I didn't care whether he did or not. The only governing motive that I had in making the trips to Read's office and for doing as I did was because of my animosity toward George Keenhold, and I desired to get even with him for some fancied wrong. That is also the reason why I did not sooner tell Judge Dudley about Keenhold's trying to have negotiations with me.''

Yet Blackburn admitted in his testimony that, when Judge Dudley came upon him in company with Read and asked him his business there, he promptly lied to him. The lie was as promptly contradicted by Read, and this resulted in the confession of Blackburn; so that this circumstance also corroborates Keenhold's denials, and is very suggestive of the probability that Blackburn was using the name of

Keenhold as an excuse for his approach to Read, and upon the supposition that Keenhold was a friend of Read's. Having committed himself to such statement, he adhered to it throughout his testimony.

To recapitulate: The conviction rests upon the uncorroborated evidence of Blackburn. The circumstances tend strongly to contradict him and to corroborate the denials of Keenhold. By undisputed evidence, Blackburn is shown to be a man of bad moral character and bad reputation for truth and veracity. It is shown also that he has been convicted of a felony; that he is a common liar; that he is a drunkard and a dope fiend; that his own acts contradict his testimony; that he has committed undoubted perjury in this very proceeding. Can we say that the uncorroborated evidence of such a witness is sufficient to sustain a conviction, and this notwithstanding the plausible denials of the accused, which are consistent with every circumstance surrounding the case? To do so would be to make a travesty of judicial procedure. It is indeed a reproach to our methods of jury selection that such a man could be drawn as a juror at all, and thereby foisted upon unsuspecting litigants.

Another suggestion is pertinent at this point. If the conviction were sustained, it would have to rest upon the theory that Keenhold was an accomplice of Blackburn's. We are not unmindful of Code Section 5489, which forbids a "conviction" upon the uncorroborated testimony of an accomplice. Whether this section can properly be held applicable to a contempt proceeding, is a question which we neither pass upon nor now consider. The plaintiff in error has claimed nothing under such section, and the question, therefore, has not been argued in the briefs. But, even though it be deemed not applicable to a contempt proceeding, nevertheless the reason underlying the statute based upon human experience appeals to the trier of fact, whether jury or judge, and warns loudly that such uncorroborated evidence is presumptively

doubtful as a matter of fact, and that it should be scrutinized and weighed with suspicious care.

II. In view of the dissenting opinions presented herewith, a further word should be added. This is not a case where the contempt is claimed to have been committed in the immediate view or presence of the court, or to have come officially to its knowledge. Nor is it so claimed by either party. The accusation was made by affidavit showing the nature of the transaction, as required by Section 4464, Code, 1897, and notice to show cause was given. Section 4465, Code. The hearing was on oral evidence, and it was preserved as directed in Code Section 4466, and the decision of the trial court based thereon, there being no statement of the judge made of record, as is exacted when he acts on personal knowledge. There is no room for the suggestion that peculiar personal knowledge possessed by the trial judge should be given weight, and this is not claimed, by either party to the proceedings. The only issue presented is whether the evidence, preserved as required by Sec. 4466 of the Code, warranted the judgment declaring complainant guilty of the contempt charged. The order is made subject to review through proceeding in certiorari by Section 4468 of the Code. Some question is raised as to the propriety of weighing or reviewing the evidence in proceedings of this kind. And yet this has been done in cases too numerous for citation, especially in those involving the sale or keeping for sale of intoxicating liquors in violation of injunctional decrees. The point was raised in *Wells v. District Court,* 126 Iowa 340, and the court, speaking through Bishop, J., after referring to the statutes, said:

"That by revision it was intended that the court sitting in review should pass upon the fact question involved, so far at least as to determine whether the act shown to have been committed was or was not sufficient in law to constitute a contempt, is made clear, as we think, by the reading of Code

2. CONTEMPT: conviction: annulment: deference to judgment of trial judge not controlling.

Section 4466. There it is provided that all the evidence upon which the action of the court is founded must be in writing, and made a part of the record. Such would be an idle proceeding if the judgment of the court as to the legal effect or sufficiency of the evidence to make out a case of contempt could in no instance become 'the subject of review. Without, further discussion, it will be sufficient to say that our reports present a number of cases where the right to review the facts in contempt cases has been assumed by this court, and we are agreed that in view of the statute such right is not open to question.''

In *Russell v. Anderson*, 141 Iowa 533, the rule was stated thus:

· ''As the proceeding is quasi criminal, a conviction should not be sustained unless the proof of guilt is clear and satisfactory,'' and should be upheld if found so to be.

The proposition that the evidence in contempt cases may not be reviewed and weighed is somewhat startling, in view of the very large number of decisions where this has been done. These decisions expressly approve such practice and lay down the rule as to the quantum of evidence essential to sustain or annul the order of the trial court. We are not inclined to depart from the rule thus established.

Upon the record before us, not only are we constrained to hold that this conviction is not sustained by sufficient evidence, but we are much impressed with the affirmative probability of plaintiff's innocence of the offense charged against him. This conclusion renders our duty plain. We share with the dissenting members of the court a due degree of reluctance to interfere with the conclusions of the trial court in matters that strike so closely to the purity of proceedings before it. Such reluctance, however, will not justify our withholding from the litigant an award of his substantial rights as we see them, within the scope of our jurisdiction to review. Otherwise, the right of appeal would be without substance. In this case, we are assured by the character and experience of the

distinguished trial judge that no one would be swifter than he to ask of us correction of error in his judgment if error be found. The order adjudging the plaintiff guilty of contempt is therefore—*Reversed* and *Annulled.*

Deemer, Ladd, Gaynor and Salinger, JJ., concur.

Weaver and Preston, JJ., dissent.

Preston, J. (dissenting).—With due respect to the judgment of my brothers, I dissent from the majority opinion. Without going into all the questions discussed, I shall refer as briefly as may be to some of them. The case was carefully and thoroughly considered before, and a part of the evidence, at least, set out at some length. So far as I have been advised, nothing new has been presented. I have no pride of opinion about it, and if I thought the original decision was wrong, I would gladly rectify it; but I have again gone over the record carefully, and, even though as the trier of the fact I might not have felt justified in convicting the defendant, yet it seems to me we cannot, under the rules of law which we have ourselves announced, escape from the conclusion that there was such a conflict in the testimony that the decision of the district judge who heard and saw the witnesses should stand. Though the original opinion was set aside by the granting of a rehearing, I desire to refer to it, and make it by reference a part of this dissent, to avoid now setting out the same matters again. The former opinion is reported in 151 N. W. 1076. It is conceded by the majority, as I understand it, that there is a conflict in the evidence. The trial court is in a better position to pass upon the credibility of the witnesses than we can be. We have so announced the rule many times.

In *Cheadle v. Roberts,* 150 Iowa 639, at 642, a contempt case, we said:

"Relators strenuously contend that the findings are without support in the testimony. . . . Now, while the findings

of fact made by the trial judge are not conclusive, they are entitled to great weight, especially where, as in this case, the testimony is conflicting, and much depends upon the credibility of the witnesses. In such cases, where the witnesses are before the trial judge, his advantageous position in discovering the truth should not be disregarded.''

In *State v. Carpenter,* 124 Iowa 5, at 11, the defendant was charged with rape, convicted and sent to the penitentiary for a long term of years, and the conviction was sustained by this court. Testimony of the prosecuting witness given before the committing magistrate was introduced in evidence as impeaching testimony, and this court said that, if believed by the jury, it would tend strongly to discredit her testimony. But it was held that the weight of the testimony of the witness, though impeached,—as it is contended the relator was in the instant case,—was for the jury. These I understand to be the uniform rules adopted by and governing this court.

To my mind, it is as important for the trier of a disputed fact question to see the witness as it is to hear what he says. In my own experience as a district judge, I have heard and seen a witness give testimony which, from his manner alone, was to my mind of little or no weight, and yet it seemed convincing in print. It seems to me that the majority opinion is a labored effort to belittle the State's evidence. I concede that the story told by Blackburn is not creditable to him, and I concede that he is not a man of good standing; yet, as stated in the original opinion, if the story he tells is true, and he is guilty of the transaction he testifies to as to his dealings with plaintiff Keenhold, then necessarily Keenhold is also guilty. It occurs to me that Blackburn's testimony ought not to be believed for the purpose of affecting his credibility as a witness, and at the same time disbelieved for the purpose of absolving Keenhold from guilt.

The opinion states that Blackburn was by his fellow jurors observed using a drug. The inference from this is

that there was some impropriety in that; but witness Curtis, who testifies to this matter, says:

"Blackburn said to me when I entered the toilet room, 'I have got an awful cold. I had to get some medicine for it.'"

Blackburn, in rebuttal, testifies that he did not tell this witness that he had a cold. His testimony is:

"I remember having an awfully severe toothache, and my face was swollen, and I asked his honor if I could be excused long enough to get something for it. I went out and got a little bottle of clove oil and chloroform that I used by rubbing on my tooth. That is the bottle that Curtis referred to."

Again, the opinion recites that Blackburn was caught in the act of petit larceny. The statute provides that it may be shown that a person has been convicted of a felony, for the purpose of affecting his credibility. The testimony to which the language just stated refers is that of a railroad agent, who testifies to Blackburn's taking a sack of coal; but Blackburn was not convicted, and the railroad agent let him go because Blackburn, as an excuse for being released, said he was in the habit of taking dope, "and sometimes I take cocaine." There was no trial, nor witnesses examined to determine whether Blackburn was guilty of petit larceny in taking the coal.

Again, the opinion says that Blackburn was a man without occupation. One witness did say that he had not known of his working for some years, but Blackburn himself says that he was a common laborer.

The original opinion makes much of the fact, in regard to the conversation about Keenhold's furnishing liquor to the jurors, that the liquor was not produced, although it is conceded, as I understand it, that his conduct in that respect was reprehensible; and it is claimed, also, that the talk between Keenhold and jurors about liquor does not corroborate the charge against Keenhold in this case. To my

mind, it is corroboration. I concede the high character of Attorney Read, and that the evidence does not show a motive for Keenhold's being interested, as the evidence shows he was, in the result of the case upon trial. It does not follow, however, that some other person interested in the suit may not have had some arrangement with Keenhold. I understand the rule to be that it strengthens a criminal case or a charge of this kind if a motive is shown, yet it is not necessary to do so.

The evidence shows that Keenhold had been a deputy sheriff; that at the time in question he was a deputy game warden, with no particular business in the courthouse except to see a man. He says he was on the third floor of the courthouse only once in several weeks before this transaction, but two or three witnesses say that they saw him on the third floor during the trial of the case in question. The evidence also shows that he had been in the retail saloon business for several years. He admits that he was acquainted with court procedure, and he must have been familiar with the rules about persons' talking with jurors and attempting to influence them. I shall in a moment set out the testimony more fully in regard to this transaction, and to my mind it does corroborate Blackburn. It shows that Keenhold was about the courthouse and the corridors suggesting that jurors drink liquor, and suggesting to one of them that he would stock a fishpond for the juror. These things all took place during the time the case then upon trial was in progress. If he was doing that with jurors generally, it tends to show a plan or system, I think, and also is competent as bearing on the question as to whether he was acting in good faith or not. The rule as to this is stated in *State v. Brady*, 100 Iowa 191, at 195, where we said:

"It is said in argument that it is not competent for the State to give in evidence facts tending to prove other distinct offenses, for the purpose of raising an inference that the defendant has committed the crime in question; nor is it

competent to show that he has a tendency to commit the offense with which he is charged. That such is the general rule must be conceded. But to this rule there are at least two well defined exceptions, which are well stated by Justice Stephen, in his work on Evidence (Art. 11) as follows: . . . 'When there is a question whether a person said or did something, the fact that he said or did something of the same sort on a different occasion may be proved, if it shows the existence, on the occasion in question, of any intention, knowledge, good or bad faith, malice or other state of mind, or of any state of body or bodily feeling, the existence of which is in issue, or is deemed to be relevant to the issue.' "

And the other exception is in regard to facts showing system. Keenhold is shown to have been a shrewd and experienced man in such matters, and it seems to me he would naturally test out the feeling of the jurors as to whether they would permit him to give them intoxicating liquors, without producing it, and would talk about it first. One of the three or four jurors to whom he talked about this seems to have been indignant about it, and that may have been the reason why the liquor itself was not produced, if he had liquor. It is fair to plaintiff to say that he testified that he had none on his person, but there is other evidence on that point, and if he did have, doubtless he would deny it, being charged with improper conduct about such a matter.

To my mind, the evidence which I shall set out later on a little more fully shows that Keenhold was unduly interested, during the progress of the case then on trial, in his intercourse with several of the jurors who were serving on that trial. Referring now to the testimony in regard to what was said by Keenhold in regard to liquor, it should be borne in mind that the juror Blackburn was one of the several jurors with whom Keenhold talked about giving them whisky. There are two or three witnesses corroborating Blackburn as to this. Goodbarn testifies, in addition to the evidence set out in the majority opinion, as follows:

"I am an inspector for the Des Moines Gas Company. I was a member of the jury in the *Powers* case, in which Blackburn was also a juror. I remember the occasion, some 4 or 5 weeks after the Powers trial commenced, of jurors Davis, Blackburn and myself standing in the corridor at recess time, talking together. Mr. Keenhold came up and spoke to us and says, 'Well boys, I have got a little whisky here that I got for a cold.'. He says, 'Maybe you would want a drink.' I says, 'Now wait a minute, George, there is nobody going to drink here. I forbid you to give them any whisky. We are not going to drink here. The best thing to do is to pass this up.' The other men said they didn't want any. Keenhold, as I remember, reached for his coat pocket, but he didn't take anything out. I didn't see any whisky, and whether he had any whisky or not I couldn't tell you.' Mr. Davis, either before or after, was talking about wanting some fish in his pond on his farm. The party in the corridor broke up because of the bailiff calling the jury into the box. I do not know if Keenhold knew that Blackburn, Davis and myself were members of the Powers jury, but he would know that we belonged to some jury. Afterwards, while the case was still being tried, I saw Keenhold at least twice in the courthouse corridor. One time I saw him near the north entrance on the first floor about adjournment time; the next time I saw him was in the corridor on the third floor. I don't remember how long this last time was before the end of the Powers trial. I saw him twice on the third floor corridor during the progress of the Powers trial. I think the first time I saw him on the third floor was when the talk was had about whisky."

Witness C. R. Davis says:

"I was a juror in the Powers case. I remember of talking in the corridor at recess time during the trial with jurors Goodbarn and Blackburn and with Mr. Keenhold. . . . Keenhold came up to us while we were standing in the corridor. When Keenhold came up, I was telling about building

a little fish pond on my place, and I asked him if he could stock it up. He said he thought he could. I knew he was deputy game warden. . . . Somebody coughed a little or something, and Mr. Keenhold or somebody made a remark to the effect that 'you ought to have something for that.' Mr. Keenhold I think then said he had something in his pocket.''

Keenhold himself, as a witness, testifies in regard to this transaction:

''When I came out of Judge McHenry's court, I saw Goodbarn and Conradi. I spoke to George Conradi by saying that 'You used to accuse me of being a politician; I see you have got to be a juror.' I understood that he was on the jury. I was joking with Conradi and Goodbarn, and Davis asked me if he could get some fish for his pond. . . . Blackburn at the time had his hat off, and I asked him what he was doing around here, and he replied that he was on the jury. . . . I cannot recall now who the man was that came up to the crowd and said that he had an awful bad cough. I said to the man, 'You ought to take my remedy; you ought to have some good liquor and honey or sugar.' Goodbarn said, 'George, if you have got any liquor, you can't use it here.' (Goodbarn, when on the stand, testified substantially as to what was said on the liquor subject.) I told Davis that I would try to get some fish for his pond. I know that jurors are not expected to use intoxicating liquor while serving. When I turned around and left Blackburn, some man whom I don't recall coughed and said he had a bad cold. In a jocular way, I said, 'You ought to take some good whisky and honey or syrup or something of that kind.' I think perhaps Goodbarn thought I was serious when he said that liquor couldn't be used here.. He simply said, in his good, old-fashioned way, 'You can't use none of that stuff here.' I think Goodbarn told the truth as he remembered it, but he misunderstood my motives in saying what I said to the man that coughed. Just then Davis inquired about obtaining fish for his pond.''

It may be remarked in passing that it is difficult sometimes for a witness to describe accurately a cough or a wink under such circumstances, but it is very readily understood by those who see it. I might also remark that, if Blackburn was in the habit of using intoxicating liquor and of borrowing small sums of money, and these facts were known to Keenhold, then such a man as Blackburn would be the one most likely to be approached.

I desire to set out a little more of the testimony of relator Keenhold. He said that he would be 67 years old in August; that, at the time in question, he came to the courthouse to see one Mead, who was going to the hospital; that he had been told that Mead was at the courthouse in one of the court rooms.

"I first went to Judge Dudley's court room. There was a jury in the box at the time. I remember speaking to John Read while in the court room, and he said something to me about it being about duck time, or if ducks were about ripe; then I went into Judge Brennan's court room looking for Mead, and then I went into McHenry's court room and did not locate Mead there. As I came into the corridor, the jury in Judge Dudley's court room had been granted a recess. I may have been at Hood's saloon on the evening of that day talking to friends for half an hour or an hour, and during that time, I may have entered the toilet room. I may have taken a drink while in Hood's saloon. I was not under the influence of liquor while in Hood's saloon. Up to four years ago, I was in the retail saloon business in Des Moines for 4 or 5 years."

Some of the witnesses testifying to Blackburn's moral character and reputation for truth were not well acquainted with him. One of them, McNutt, says:

"I do not know where he now lives. He used to live at different places in East Des Moines. That was some years ago. . . . I have not been in a position where I paid any attention to him or heard much about him."

Witness Simms, a city detective, testifies to Blackburn's moral character, that it was bad, but on cross-examination says:

"I mean that Blackburn is a man who is considered by the police department as an undesirable, and as belonging to the gang of 'can-rushers.'"

It is impossible, of course, to set out all the evidence, and I shall not take the time or space to refer further to the testimony. As I understand the record, the Powers case, then on trial, had been proceeding for 4 or 5 weeks, and was an important case. When this matter came up, the trial court promptly, and, as I think, very properly, discharged the jury in that case, upon the record, or at least a part of the record, we now have before us in regard to this matter. To my mind, to hold that Keenhold is not guilty is to hold that Blackburn was not guilty of the acts charged, and that the trial judge improperly discharged the jury. It may be thought that the items of evidence I have set out do not all directly corroborate the particular charge made against the relator, but some of them do directly, and others indirectly. In my opinion, even though Blackburn is impeached, there was, under the rules of law and under the record in this case, such a conflict in the evidence as to make it a question for the trial judge, and I think the evidence is sufficient, and the corroboration, if any is required, sufficient, to sustain the conviction. I would affirm.

WEAVER, J.—I agree with Mr. Justice Preston that the judgment of the district court in this case is one which we ought not to disturb. Contempt of court committed in the actual or constructive presence of the court by interfering with the orderly course of justice is one thing; contempt of court, punishment for which is provided by statute as an aid to the enforcement of a civil right or of the administration of the criminal law, is quite another thing. The right to take cognizance of and punish the former is inherent in every court of record. In the latter case, hearing can be had and

punishment inflicted only upon the individual complaint of some person aggrieved, or of some officer or some individual citizen acting in the public interest. In the first case, vindication of the authority and dignity of the court is the primary object in view; but in the latter, it is the vindication of a private right or of the authority of the law, rather than of the court itself. In the first case, as I already suggested, the authority to hear and punish is inherent in the court; while in the second case, it is ordinarily conferred by statute. The business of a trial court, the conduct of a trial, and the demeanor and behavior of persons in and about the court, are peculiarly under the observation of the trial judge; he is naturally and properly sensitive to the atmosphere which envelops a case on trial; and, if there be any malign or improper influence at work to thwart the due course of justice, apparent to him or brought to his notice, it is of the highest importance that he shall promptly take official cognizance of it and, by prompt punishment of the contemnor, discourage its continuance or repetition. To put it in the power of the offender to delay his punishment by appeal or certiorari, and to hold that the appellate tribunal, which cannot possibly know or appreciate the situation as it was seen and known by the court below, may proceed to a technical review of the sufficiency of the evidence, is in effect to render the power and right to punish for contempt of very little value for the protection of trial courts. It is true, doubtless, that the scope of review by certiorari in contempt proceedings generally has been materially enlarged in many jurisdictions by statute or by established practice, but the great weight of the authorities and precedents still tend to maintain the rules which protect proceedings for punishment of contempts committed in open court, or in its constructive presence, against nullification upon appeal or by certiorari, save only where gross abuse of discretion is made clearly to appear.

"In the absence of statutory regulation, the matter of dealing with contempts, and when and how they shall be

punished, are within the sound discretion of the trial court, and, unless such discretion is grossly abused, the decision must stand." 9 Cyc. 67, and cases in note.

"Every fact found by a court in a proceeding for contempt is to be taken as true, and every intendment is to be made in favor of its record, if it appears within the jurisdiction of the court." Id. p. 68.

Nor will the credibility of witnesses be inquired into by the reviewing court upon certiorari. *Carver v. Chapell,* 70 Mich. 49. In many jurisdictions, it is held that, upon certiorari for contempt, only jurisdictional matters will be inquired into (*McClatchy v. Superior Court,* 119 Cal. 413); and, while it may be admitted that the rule is not thus strictly narrowed in our practice, it illustrates the general intent and purpose of appellate tribunals to preserve in the trial courts an effective power to vindicate and maintain their own dignity and authority. It has been held in this state that, where a tribunal is vested with discretion, the correctness of its decision will not be inquired into upon certiorari. (*Hildreth v. Crawford,* 65 Iowa 339), and that, upon such proceeding, this court will not consider the weight of the evidence (*Wise v. Chaney,* 67 Iowa 73), though it may be conceded that this court will look into the evidence far enough to see whether, taking it as true, it has any tendency to prove an act which, under any view of the case, will constitute a contempt (*Wells v. District Court,* 126 Iowa 340). Beyond that, we cannot go, without depriving the trial courts of all effective power for the punishment of contemptuous behavior in their presence.

I do not care to review the evidence in this case, further than to say that there is testimony which, if true, shows an act clearly punishable as for contempt, and I think there is nothing clearer or better established than that we have no authority to pass upon its credibility. No court has ever gone to the extent of holding that, upon certiorari or upon

appeal in contempt proceedings, the defendant is entitled to a trial *de novo;* yet, as I read the majority opinion, this is what the court awards to this defendant; for it is only by reviewing the evidence and passing adversely upon the credibility of the principal witness that the result announced by the majority is possible.

The holding of the majority is, in my judgment, a very unfortunate one, and may well bring discouragement to the judges of trial courts, especially those in populous centers where judicial proceedings (especially trials to a jury) are peculiarly exposed to contaminating and corrupting influences, the discovery and exposure of which is always difficult and often impossible.

I think the writ of certiorari should be dismissed.